**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LILA T. GAVIN,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      No. 01 C 2721
                                        )
AT&T CORP. and GEORGESON                )
SHAREHOLDER COMMUNICATIONS, INC.,       )
                                        )
            Defendants.                 )

<u>**MEMORANDUM OPINION**</u>

Plaintiff Lila T. Gavin brings this putative class action against defendants AT&T Corp. ("AT&T") and Georgeson Shareholder Communications Inc. ("Georgeson") alleging fraud in violation of the federal securities laws and New York common law in connection with a post-merger stock exchange program. Before the court are defendants' separately-filed motions for summary judgment. For the reasons set forth below, AT&T's motion is granted, and Georgeson's motion is granted in part and denied in part.

<u>**FACTUAL BACKGROUND**</u>

The following facts are undisputed unless otherwise noted.[1]

---

[1]The present motions were originally filed as motions to dismiss. However, because defendants attached evidence beyond the scope of the pleadings, we converted their filings into motions for summary judgment. <u>See</u> <u>Gavin v. AT&T</u>, 2004 WL 2260632, at *1 (N.D. Ill. Sept. 30, 2004). We gave the parties an opportunity to conduct discovery and to file fresh summary judgment papers supplemented with the

## **The Mergers and the Stock Exchange Notices**

In 1998, Gavin was a holder of 235 shares of US West Media Group ("US West") common stock. That year, US West split off from US West, Inc. and merged with MediaOne Group, Inc. ("MediaOne"). Gavin's US West shares became exchangable for MediaOne shares on a one-for-one basis. In June 1998, MediaOne sent US West shareholders, including Gavin, a notice requesting that they exchange their US West shares for MediaOne shares. Gavin did not do so.

Then, in June 2000, MediaOne merged with AT&T. The terms of the merger were set forth in an August 1999 MediaOne Proxy Statement that was mailed to all MediaOne stockholders and those, like Gavin, still holding unexchanged US West shares. (AT&T Ex. A ("Proxy").) The Proxy stated that MediaOne and US West shareholders had the option of exchanging their stock certificates for AT&T shares, cash, or a combination of the two. The Proxy indicated that instructions on how to exchange the shares would be mailed following the merger. There was no mention of a fee in connection with the share exchange.

On June 15, 2000, the merger then complete, AT&T sent to

results of that discovery. The parties have done so. Yet, inexplicably, no party has filed a statement of undisputed facts as required by Local Rule 56.1. The burden on the court caused by the parties' noncompliance, though tangible, has not been significant only because the record is largely uncontested. Going forward, however, a party who chooses to ignore the requirements of the Local Rules does so at its own peril.

US West and MediaOne shareholders a notice explaining the share exchange alternatives (stock, cash or both) and an election form. (AT&T Ex. B ("June 15 notice").)   The notice requested that shareholders send their election form and stock certificates in an enclosed pre-addressed and insured envelope to AT&T's transfer agent, EquiServe Trust Company ("EquiServe").  The notice "strongly encourage[d shareholders] to return the necessary documents as soon as possible," and provided a toll-free telephone number if shareholders "[had] any additional questions that aren't answered here . . ."  (Id.)  Like the Proxy, the June 15 notice did not state that shareholders would be charged a fee for exchanging their shares.

AT&T sent a second, similar notice on August 1, 2000 to shareholders who still held certificates of US West or MediaOne stock.  (AT&T Ex. C ("August 1 notice").)  The notice contained instructions on how to exchange shares through EquiServe, along with an insured, pre-addressed envelope.  The notice stated that "[i]t is important that you return your certificates promptly," and included a toll-free telephone number for "questions about this procedure or anything related to this transaction." (Id.)  Again, the notice did not indicate that any fee would be incurred for exchanging the shares.  Shareholders who did exchange their shares through EquiServe in response to the June 15 or August 1 notices were in fact not charged any fees.

Many MediaOne and US West shareholders, including Gavin, did not respond to either notice, and still held their unexchanged shares. AT&T therefore hired Georgeson to conduct a "post-merger cleanup" ("PMC") which, according to Georgeson's website, is a program intended "to reunite as many as 90% of unexchanged shareholders with their rightful assets, all at no cost to our clients." (Sec. Am. Compl., ¶ 25.) A "Postmerger Cleanup Agreement," entered into between AT&T and Georgeson on December 15, 2000, provided the details of the PMC:

> AT&T Corp. ("T") has agreed to retain Georgeson Shareholder Communications Inc. ("GSC") to contact unexchanged shareholders . . . of MediaOne Group, Inc. and US West Media Group and assist them in surrendering their old stock certificates in exchange for the new certificates and any cash due them (the "Program"). It is understood that previous communications have been sent to the last known addresses of the unexchanged accounts but have been unsuccessful in effecting the surrendering of their old stock certificates. Unexchanged shareholders will finance the Program and T will incur no expenses in connection with this project. All costs, including exchange agent and transfer agent fees, will be borne by GSC. The exchanging shareholders will be charged a processing fee by GSC's broker-dealer subsidiary, Georgeson Shareholder Securities Corporation, as mutually agreed upon by T and GSC. No deduction from proceeds shall be made from any exchanging shareholder without an agreement signed by each authorizing said deduction.
>
> *     *     *
>
> GSC will prepare materials to be sent to the individual shareholders fully explaining the transaction and the amounts to be deducted. T will have final approvals on all industry standard materials to be sent out. Both T and GSC reserve

the right to waive processing fees from any shareholder on a case by case basis. During the program, if any shareholder contacts GSC inquiring about how they can contact the transfer agent directly to facilitate their exchange, GSC will direct them to the transfer agent without charge. It is agreed that any shareholders who return their stock directly to T or its transfer agent, even after being contacted by GSC, will be entitled to full exchange value and that GSC will not be entitled to any fee or other costs in connection with that exchange.

\*     \*     \*

The project will involve three participation periods, with the initial period having a 6-week deadline for acting and then two subsequent periods of similar duration. The initial period will begin on December 15, 2000 and end on January 23, 2001. It is understood that the timing of the subsequent periods will depend upon other T activities and will be scheduled at mutually agreeable dates after the end of the initial period. If mutually agreed, an additional period may be added to the project at the end of the 3rd period. GSC will provide T with [a] status report every week. . . .

(AT&T Ex. D ("the PMC Agreement").)

On December 15, 2000, Georgeson sent a notice to all MediaOne and US West shareholders who had yet to exchange their shares. The notice sent to US West shareholders, including Gavin, stated as follows:

Dear Stockholder:

Our records show that you still hold shares of **US WEST MEDIA GROUP**. There is no longer a market for these shares as a result of the 1998 split off from **US WEST** and exchange into **MediaOne Group, Inc.** Each share of **US WEST Media Group** was exchangable into **MediaOne** on a one-for-one basis.

Subsequently, in June 2000, **MediaOne** merged with **AT&T Corp.** Following the merger, you are now due 0.95 of a share of **AT&T** and a cash payment of $36.27 for every **US WEST Media Group** share you hold, plus all accrued dividends paid on these shares. Based on AT&T's $22 price per share on December 14, 2000, each share of **US WEST Media Group** would receive merger consideration of approximately $59. Both the number of **US West Media Group** shares you own and the **AT&T** shares and cash payment due you is indicated on the attached Claim Card.

We have retained Georgeson Shareholder Communications, Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per US WEST Media Group share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC. **Even if you do not have your US West Media Group certificate(s), you may still participate in this voluntary program.**

Please read the enclosed materials carefully. **There is no benefit in continuing to hold your old shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.** Georgeson Shareholder Communications Inc. is being permitted to administer this voluntary program through **January 23, 2001.** If you have questions after reading this material, please call GSC's toll-free number, at 1(888)352-4639 for assistance.

Sincerely,

**AT&T Corp.**

(AT&T Ex. E ("December 15 notice").)[2] Gavin tendered her US West stock certificates to Georgeson in January 2001 in exchange for AT&T shares plus cash. In doing so, Gavin incurred a $7 "processing fee" for each AT&T share she received.[3]

### Shareholder Complaints

Gavin did not attempt to contact either Georgeson or AT&T to complain about the fee. Other US West shareholders did, however.[4] Shareholders who telephoned Georgeson to complain about the $7 fee were told by a Georgeson agent that they would receive a return call from a "qualified representative." The agent would write down the shareholder's contact information, the total "processing fee" the shareholder stood to incur, and a summary of the shareholder's complaint, all on a form titled "PMC Fee Reduction/Discussion Follow-Up." (Gavin Exs. 2,3,6 ("Follow-Up forms").) The complaint summaries, as recorded on the Follow-Up forms, are as follows:

---

[2]A materially identical notice was sent to MediaOne shareholders. Each of the notices – the June and August notices directing shareholders to EquiServe, and the December notice steering them to Georgeson – bears AT&T's corporate logo and is signed either by an AT&T employee or simply as "AT&T Corp."

[3]By our calculation, Gavin paid a total fee of $1,562.75.

[4]Discovery in connection with the present motions was limited to inquiries made by holders, like Gavin, of US West stock. (See Tr. Nov. 3, 2004 Hrg., p. 9 ("I am going to limit the discovery to the U.S. West Media Group transaction. . . . [I]t's appropriate for the plaintiff to have access to any communications between Georgeson and any shareholder in the U.S. West Media Group, not any other shareholders and not any other transactions.").

S/H would like a qualified rep. to discuss fees w/him.

Would like to discuss fees.

Is not happy with Fee wants someone to call him considering fee.

S/H would like to discuss proc. fee.

S-H irate about service fee.

Requesting a fee reduction on her media group acct. Concerned about outrageous price. . . .

Shareowner feels that the fees are too high. . . . [W]ould like a call regarding this issue.

Would like to discuss the fee.

[N]ot happy with service fee, wants some[one] to discuss fee.

[C]alled and requested that someone please call her back regarding the fee reduction.

S/H asked what will be the effect on my shares? At this point I provided a breakdown including shares due, amount due (no calculations done) and fee. After mentioning fees, S/H asked if there was a way to avoid this. I told him it would be followed up on by a qualified rep. and in the meantime, the materials would be remailed. Also provided phone # for Media Group (in case no one called him back).

Wants call back to negotiate fee.

[C]alled to ask about service fee . . . he requested to have a cert. rep. call him back to discuss fees.

S/H feels that the fee is ridiculous and is not willing to pay. He would like to discuss fee with a qualified rep.

Wants to negotiate $7 fee.

Shareholder wanted someone to call him back to discuss fees.

Wanted reduced fee.

Please have someone get back to her regarding paying the fee; she does want to cooperate but does not feel she should have to pay the fee.

Would like to negotiate the fee.

S/H spoke to broker and felt the fee was ridiculous.

Wants to discuss reducing fees.

Both parents deceased right around time of merger.

[W]as not too happy about the processing fee. She would like someone to call back.

Elderly S/H concerned by fee. Spk to S/H's friend but he said S/H should be able to understand what's going on.

Would like to discuss fees.

Requested conference on processing fees.

(Id.) Some shareholders telephoned Georgeson more than once:

She was supposed to be contacted by the fee reduction people and has not heard from anyone yet!! That was on the 4th!! Said to please leave message if you get recorder!! [Follow-Up form dated 1/10/01]

Called because no one contacted them about fee reductions.

Concerned she hasn't rec'd a call back from svc rep re fee reduction. She called 1/8/01. Said I would fill out a 2nd fee reduction form but to hold on, someone would get back to her. She's worried she'll miss the deadline (1/23/01). Please call. [Follow-Up form dated 1/9/01]

(Id., Exs. 2,3.) The "processing fees" noted on these Follow-Up

forms ranged from $21 to $1,540. (Id., Exs. 2,3,6.)[5]

Ultimately, the shareholders who called Georgeson to complain obtained mixed results: some paid the entire fee; some paid a reduced fee; and some paid no fee because Georgeson waived it or made a referral to EquiServe.[6]

Other shareholders complained directly to AT&T. One sent an undated e-mail to David Dorman, then-president of AT&T, stating the following:

> I am a long time holder of ATT&T [sic] stock and also a holder of 100 shares of Media One group. We received a notice from ATT&T about the acquisition of Media One. This in itself was

---

[5] According to Georgeson's counsel, these are all the complaints received by Georgeson from US West shareholders. (Tr. Dec. 15, 2004 Hrg., p 10.)

[6] While it is undisputed that many (if not most) of the shareholders who complained to Georgeson ended up paying a full or reduced fee, the record does not give us exact figures. Nor do we know what each of the complaining shareholders was told by the Georgeson representative who placed the follow-up call. Several of the Follow-Up forms, however, do contain notes taken by the representative who made the return call (in addition to the notations from the original call). These notes indicate that one shareholder was told that her fee of $287 would be waived; one shareholder was told that his fee of $1,540 would be reduced by $400; three shareholders with fees of $267, $70, and $21, respectively, were given EquiServe's telephone number; one shareholder with a fee of $1,330 was "thinking about it" and remained "undecided"; and another with a fee of $21 was "not interested" in the program. The majority of the forms have no such "follow-up" notes. So, if no notes were taken, does it follow that the representative did not waive or reduce the fee, or refer the shareholder to EquiServe? In other words, does the absence of any "follow-up" notation mean that the call involved nothing more than an explanation of the processing fee, with an expectation that it would be paid? The record does not answer these questions. Nonetheless, what is important for purposes of summary judgment (more on this below) is that it is undisputed that many of the shareholders who called Georgeson to complain still ended up paying either the full or a reduced fee.

O.K., but upon reading the details I want you to
know I became quite upset. I can't believe a
responsible person in the ATT&T organization would
be willing to make the stock holders of Media
[O]ne have to pay a commission of $7.00 per share
for each share of ATT&T we are to receive for our
Media One. Whoever made such a deal with the
Georgeson Shareholder Securities Corp. should be
immediately discharged. I have been involved in
quite a few stock transaction[s] during the last
fifty years and I can never recall a time when we
had to pay such an enormous fee for handling a
transaction such as this. I have always had
respect and admiration for ATT&T but if they are
going to continue to make deals like this ATT&T
will certainly continue to deteriate [sic]. It is
our intention to sell all of [our] ATT&T holdings
as well [as] switch companies for our long
distance provider.

(AT&T Ex. H.)[7]    Patrick Anderson, Director of AT&T Shareowner

Services, responded on January 12, 2001 with the following e-mail:

Thanks for the message. I'm sorry for the
confusion over this voluntary program currently
offered by Georgeson for Mediaone [sic]
shareholders who have still not exchanged their
shares for AT&T shares. In order to reach these
people and encourage them to exchange, we allowed
Georgeson to develop this voluntary program. So
far, approximately 10% of the eligible accounts
have elected to exchange their shares through this
program. At the end of the program, we expect
about 25% of the eligible accounts to participate.
Others such as yourself were upset about the
voluntary program. Those people have been
encouraged to proceed with their exchange directly
through the transfer agent at no cost to the
shareowner. Please remember that all Mediaone
shareowners have already been sent at least two
requests asking them to exchange their shares for

---

[7]We note that this e-mail was sent by a holder of MediaOne, and
not US West stock. No matter. Although discovery was limited to US
West shareholders, this e-mail was produced and we find it – and more
importantly, AT&T's response – relevant to the present motions.

free through the transfer agent. We only use the voluntary programs because many of our shareowners enjoy paying for the convenience of this service which ends up costing the participants about 12% of their assets when you take into consideration the cash portion of the proceeds. If you wish to proceed with the free exchange of your Mediaone shares, please contact the transfer agent, EquiServe, at 800-348-8288. Thanks for your interest in AT&T.

(Id.)

Another shareholder e-mailed the following to AT&T on January 14, 2001:

I received a letter in Dec. 2000 from Georgeson Shareholder Com. requesting that I send my 629 shares of US West & Media One . . . to convert them into cash and AT&T shares. I want to convert the shares into ATT stock, however, am incensed that I will be penalized $7.00 per share to make this conversion. I do not believe I should be assessed this fee, since this is the first notification I have received re: stock conversion. Since 1946, I have been an ATT shareholder and loyal through all the changes since de-regulation; however, this may be the last straw. . . .

(AT&T Ex. I.) The e-mail made its way to Mr. Anderson, who forwarded it to another AT&T employee, with the following message:

FYI- Please call . . . and explain the free option through EquiServe for exchanging her Mediaone [sic] shares. Also remind her she should have received two earlier notices about exchanging her shares. Perhaps we should verify her address too. Thanks.

(Id.)

This next e-mail was sent to AT&T, and Georgeson, on February 23, 2001:

I read the following on Georgeson's web page: "In the ensuing six decades, Georgeson built a

leadership position in the proxy solicitation industry by focusing on two core beliefs: 1) we will always be customer driven and our products and services must always add value to the client; and 2) we will always maintain our commitment to the highest ethical standards and the highest standards of business conduct." In my opinion your fees charged for exchanging shares of stock, for example $7 to exchange US West Media Group to ATT plus cash, does not fit the code of ethical standards you express. If a shareholder has 1 to 20 shares, it might be [a] reasonable fee. But for those people who use Georgeson to exchange 200, 300, 400 shares, or maybe many more, the fee is outrageous. The[re] is little more work in exchanging 400 shares than 1 share, but a fee of $2800 for the work done would be extreme. I would hope that you would recognize that and charge according to a sliding fee scale that would be more realistic. I can only hope that there are not too many people that have opted to use your service for larger amounts of shares, under the auspices of major corporations who have hired you.

(AT&T Ex. H.) Mr. Anderson sent the following response on February 26, 2001:

Thanks for your message below. The fee structure established for the unexchanged account program with Georgeson is designed to be simple and easy. Most of the unexchanged accounts have a small total value. Obviously, accounts with large numbers of shares would pay a much higher fee to use the services of Georgeson instead of handling the transaction on their own directly with the transfer agent. AT&T wants to make sure that former Mediaone [sic] and Media Group shareowners receive their entitlement as soon as possible. The Georgeson program material has been mailed to all of the shareowners (approximately 50,000) who for some reason have chosen not to respond to the earlier multiple mailings from our transfer agent, EquiServe, encouraging the exchange of their shares at no cost to the shareowner. Approximately 57% of the unexchanged Mediaone accounts and 39% of the unexchanged Media Group accounts have chosen to participate in the program

> offered by Georgeson. Georgeson has agreed to
> negotiate lower rates for shareowners who feel the
> $7 per share fee is too high but still want to
> take advantage of Georgeson's assistance in
> exchanging their shares. Of course, shareowners
> can always handle the exchange on their own at no
> cost by contacting the transfer agent, EquiServe,
> as listed on the original mailings to all Media
> Group and Mediaone shareowners. If you have
> already participated in the Georgeson program and
> would like us to consider lowering the fee, please
> feel free to contact me to review your situation.
> Thanks for your interest in AT&T.

(Id.) The evidence is that any shareholder who complained directly
to AT&T about the $7 fee was referred to EquiServe.

AT&T received regular status reports from Georgeson
regarding the progress of the PMC, but there is no evidence that it
was notified when Georgeson received a complaint about its
processing fee. AT&T, on the other hand, appears to have kept
Georgeson abreast of any complaints it received. Georgeson was
copied on each of above e-mails sent to shareholders by Mr.
Anderson. In response to a Georgeson status report (which is not
part of the record), Mr. Anderson sent the following in a January
9, 2001 e-mail:

> Thanks for the update. I'm glad the program is
> going well. We have received several (10 or so)
> complaint letters about the high fees. We are
> simply advising the complainers that they may
> still exchange for free through the transfer agent
> if they wish to do the work themselves. Please
> insure that if people call to complain to GSC that
> they are provided with the toll free number at
> EquiServe so they may handle the work on their
> own. We do not expect GSC to do the exchange for
> complainers and waive the fee but that is up to
> GSC. Many people are not taking into

consideration the cash portion and thinking of the $7 fee as a high (35%) portion of the assets instead of the more reasonable 12% of the assets including the cash. . . . We want to make sure GSC makes a reasonable profit on the program while keeping the cost as low as possible. In my opinion, . . . the program could still be profitable to GSC for a smaller per share fee (say $5 instead of $7). At the end of the program, we want to discuss the financial results with you to make sure the program was profitable for GSC while still keeping the fee as low as possible for future programs. . . . [W]e appreciate GSC's willingness to discuss the detailed financial results of the programs so that future programs can be designed to be both profitable and shareowner friendly. This is what makes for a good ongoing relationship between GSC and AT&T. Thanks.

(Id., Ex. F.)

In the end, of the 113,000 shareholders who received the December 15 notice, roughly 44,000 of them sent in their stock certificates pursuant to the Georgeson program, representing approximately 29% of US West shareholders and 44% of MediaOne shareholders. (Gavin Ex. 9.)

## PROCEDURAL HISTORY

The procedural history of this case is rather involved, and was set out in detail in our opinion of November 26, 2003. See Gavin v. AT&T, 2003 WL 22849128, at *2-4 (N.D. Ill. Dec. 1, 2003). We will not repeat it in full here, but will provide a brief recap. On February 9, 2001, Gavin commenced this putative class action by filing in the Circuit Court of Cook County, Illinois a complaint against AT&T and Georgeson on behalf of herself and others who

similarly exchanged their US West shares for AT&T shares through Georgeson. The complaint alleged four Illinois state law claims and expressly disavowed any claim for violation of the federal securities laws. In a nutshell, the complaint asserted that defendants fraudulently induced Gavin and the other alleged class members into exchanging their US West shares through Georgeson for "commercially unreasonable and unnecessary fees" by failing to disclose the free means of exchange through EquiServe.

Defendants removed the action to the United States District Court for the Northern District of Illinois as preempted under the Securities Litigation Uniform Standards Act, 15 U.S.C. §§ 78bb(f), *et seq.* ("SLUSA"). The case was assigned to Judge John A. Nordberg. Gavin filed a motion to remand, which was denied, and defendants filed motions to dismiss, which were granted – all on preemption grounds. Gavin was given leave to file an amended complaint that asserted a claim under the federal securities laws.

Over the next *fifteen* months, Gavin made a series of unsuccessful attempts at obtaining appellate review of Judge Nordberg's dismissal order. Finally, on April 11, 2003, Gavin filed an amended complaint. The complaint re-alleged the four Illinois state law claims previously dismissed by Judge Nordberg, together with new "contingent" federal securities law claims. While reasserting representation of the purported US West class, Gavin's amended complaint alleged in the alternative a vastly

expanded "nationwide" class defined as "all residents . . . who exchanged any company's certificates or shares and were charged a per-share fee by [Georgeson]." (Am. Compl., ¶ 42.)

One month later, the case was reassigned to our docket, and defendants moved to dismiss the amended complaint. We dismissed the state law claims, for the second time, as preempted by SLUSA. See Gavin, 2003 WL 22849128, at *4. As for the federal claims, Gavin had "curiously labeled [them] as 'contingent' counts, effective upon a final determination that these claims are pre-empted and governed by federal law." Id. at *4. Defendants claimed confusion over whether the "contingent" counts even purported to state a then-present claim, and moved to dismiss on that basis alone. After finding that "[a]ll parties know that there is nothing 'contingent' about Gavin's federal claims and that they are presently in play," we denied defendants' motions to dismiss those claims. Id. at *5. Gavin was given an opportunity to file a second amended complaint.

On December 10, 2003, Gavin filed a Second Amended Complaint, the incarnation now before the court(and hereafter, "the complaint"), with the same US West and alternative "nationwide" class allegations that were pled in the previous complaint. Count I alleges New York state law claims for constructive fraud and breach of fiduciary duty against AT&T and Georgeson for inducing putative class members to "exchange their certificates . . . on

commercially unreasonable terms, when they otherwise would not have agreed to the proposed transaction had full and fair disclosure been made by Defendants." (Sec. Am. Compl., ¶ 34.) Count II claims violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), against both defendants for (i) failing to disclose the free alternative to exchanging shares through Georgeson, and (ii) representing that the shares had to be exchanged through Georgeson or would be lost. Count III, brought only against Georgeson, asserts (i) a violation of Section 10(b) and Rule 10b-5 for failing to disclose the total processing fee that would be incurred by exchanging shares through Georgeson, and (ii) a violation of Rule 10b-5 and National Association of Securities Dealers ("NASD") Rules for charging an "excessive mark-up" for the share exchange.

Defendants again moved to dismiss the complaint. This time, defendants attached in support of their motions several pieces of evidentiary material – including the June and August 2000 notices – consideration of which we believed would significantly advance the litigation. Having no basis to treat the documents as part of the pleadings, we converted defendants' motions to dismiss into motions for summary judgment. See Gavin, 2004 WL 2260632, at *1. Presently before the court, then, are AT&T's and Georgeson's respective motions for summary judgment on the complaint in its

entirety.

## ANALYSIS

### I.   Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the initial burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Should the moving party meet this burden, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e); Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996).  A genuine triable issue exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether there are "genuine issues of material fact," the court considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. See Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002).

### II.   Section 10(b) and Rule 10b-5 Claims

Section 10(b) makes it unlawful for a person "to use or

employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Among those rules is Rule 10b-5, which "prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security." In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996).[8] To prevail on a Rule 10b-5 claim, a plaintiff must establish that the defendant: (i) made a false statement or omission, (ii) of material fact, (iii) with scienter, (iv) in connection with the purchase or sale of securities, (v) upon which the plaintiff justifiably relied, and (vi) the false statement or omission proximately caused the plaintiff's injury.

---

[8]Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

<u>Otto v. Variable Annuity Life Ins. Co.</u>, 134 F.3d 841, 851 (7th Cir. 1998).

Congress intended Section 10(b) to be a "catchall antifraud provision," <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 382 (1983), and to be "read flexibly, not technically and restrictively." <u>Superintendent of Ins. v. Bankers Life and Casualty</u>, 404 U.S. 6, 12 (1971). Liability will attach to any person who meets Section 10(b) and Rule 10b-5's required elements, regardless of that person's role in the fraud. <u>See</u> <u>Anixter v. Home-Stake Production Co.</u>, 77 F.3d 1215, 1224 (10th Cir. 1996).

Counts II and III, taken together, assert four separate misrepresentations in violation of Section 10(b) and Rule 10b-5. Three alleged misrepresentations – two omissions and one affirmative statement – were allegedly contained in the December 15 notice. The notice was misleading, according to Gavin, because it:(i) failed to disclose the free alternative to exchanging shares through Georgeson, (ii) failed to disclose the total processing fee that would be incurred, and (iii) represented that the shares had to be exchanged through Georgeson or would be lost. The fourth misrepresentation is defendants' agents alleged failure to disclose the EquiServe alternative to shareholders who called to complain about the fee. We begin with the notice.

**A.    Alleged Misrepresentations in the December 15 Notice**

       *1.    Failure to Disclose Alternative Means of Exchange*

The nub of this case is Gavin's contention that by failing to disclose the EquiServe option in the December 15 notice (and in subsequent representations), AT&T and Georgeson misled US West shareholders into believing that participating in Georgeson's program was the only way to exchange their shares.

Defendants contend that the omission is not actionable under Rule 10b-5 and rely heavily on the case of <u>Starr v. Georgeson Shareholder, Inc.</u>, 287 F.Supp.2d 410 (S.D.N.Y. 2003). <u>Starr</u> is an almost identical case. AirTouch Communications shareholders who exchanged their shares for Vodafone shares through a Georgeson "post-merger cleanup," and incurred a $3.50 per share "processing fee," brought a class suit against Georgeson for omitting from its solicitation notice the fact that shares could be exchanged through Vodafone's exchange agent, EquiServe, free of charge. The Airtouch shareholders had been sent two mailings explaining the free EquiServe alternative prior to receiving the Georgeson notice. The court granted Georgeson's motion to dismiss:

> It is clear that the Georgeson communications did not state that shares could be submitted directly to the exchange agent, or by the addressees' broker or bank. . . . But the fact that there were alternative, and cheaper, methods of effecting the exchange did not render the Georgeson statements untruthful. Those statements were accurate as far as they went. Omissions "are only actionable where they cause the statements actually made to be misleading or if disclosure is required by a regulation or statute." *Castillo v. Dean Witter Discovery and Co.*, 1998 WL 342050, at *8 (S.D.N.Y. June 25, 1998), citing *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992).

> Furthermore, the availability of the alternative
> means was already part of the "mix" of information
> readily available (in fact, mailed directly) to
> the AirTouch stockholders, who had been informed
> of the cost-free exchanges available through
> Equiserve, in Vodafone's two earlier mailings.
> "'The securities laws require disclosure of
> information *that is not otherwise in the public
> domain*,' not information that has already been
> publicly – indeed, officially – disclosed by the
> company." *Hillson Partners Ltd. P'ship v. Adage,
> Inc.*, 42 F.3d 204, 212 (4th Cir. 1994), quoting
> *Sailors v. Northern States Power Co.*, 4 F.3d 610,
> 613 (8th Cir. 1993).

*    *    *

> Any AirTouch stockholder dissatisfied with the
> Georgeson proposition could with minimal diligence
> have investigated the already-disclosed
> alternative means of exchange. "An investor may
> not justifiably rely on a misrepresentation if,
> through minimal diligence, the investor should
> have discovered the truth." *Brown v. E.F. Hutton
> Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).

287 F.Supp.2d at 413-14.  Defendants forcefully argue that the

reasoning in <u>Starr</u> applies equally to this case.  We agree.

The <u>Starr</u> holding hinges, albeit implicitly, on Rule

10b-5's related requirements of materiality and, in the case of an

omission, a duty to disclose.  An omission is material under Rule

10b-5 if "there is a substantial likelihood that the disclosure of

the omitted fact would have been viewed by the reasonable investor

as having significantly altered the 'total mix' of information made

available." <u>Pommer v. Medtest Corp.</u>, 961 F.2d 620, 623 (7th Cir.

1992) (citations omitted).  There is no evidence (or allegation)

that Gavin or other US West shareholders did not receive the June

or August 2000 notices which detailed the procedure for exchanging their shares at no cost through EquiServe. "[A] reasonable investor is presumed to have information available in the public domain, and therefore . . . is imputed with constructive knowledge of this information." Whirlpool Financial Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 (7th Cir. 1995); see also Panter v. Marshall Field & Co., 646 F.2d 271, 289 (7th Cir. 1981) ("[P]laintiffs cannot complain merely because [the defendant] did not reemphasize facts that . . . would have been known to the ordinary investor through papers of general circulation."); Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978) ("[T]here is no duty to disclose information to one who reasonably should already be aware of it."); Chu v. Sabratek Corp., 100 F.Supp.2d 827, 834 (N.D. Ill. 2000) ("A plaintiff cannot credibly claim to be misled by a company's attempt to hide negative information when that same information is publicly available via alternate channels."); Debora v. WPP Group PLC, 1994 WL 177291, at *8 (S.D.N.Y. May 5, 1994) (The federal securities laws "do not provide insurance for investors who either ignore or neglect the underlying public information. . . ."). If shareholders had questions, the June and August notices provided a toll-free telephone number for AT&T, and the December notice provided a toll-free number for Georgeson.[9] In sum, because

---

[9]The fact that some shareholders may have later been misled by Georgeson's telephone agents, see discussion infra, does not support the claim that there was a material omission in the notice.

US West shareholders are deemed, as a matter of law, to have been aware of the twice-disclosed free exchange alternative, repeating that option in the Georgeson notice would not have "significantly altered the 'total mix' of information made available."  See Pommer, 961 F.2d at 623.  The omission of the EquiServe information from the December 15 notice was not material.

Moreover, there was no duty of disclosure.  Rule 10b-5 imposes liability for an omission only when there is a duty to speak.  See Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak."); Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1202 (1st Cir. 1996) ("The proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law.").  A duty to disclose arises under Rule 10b-5 when an omission makes some existing statement misleading.  See 17 C.F.R. § 240.10b-5 ("It shall be unlawful . . . to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.").

Gavin does not point to a specific statement in the notice rendered misleading by the omission.  She argues instead that the notice, as a whole, was misleading in that it falsely suggested that Georgeson provided the exclusive means of exchange.  As in the materiality analysis, whether the notice was misleading is

evaluated in the context of all of the public information available to the US West shareholders. And when read in conjunction with the earlier EquiServe notices, the December 15 notice did not falsely indicate that there was no other way to effect an exchange. The notice explained the share exchange process, conspicuously disclosed the $7 fee, twice stated that the program was "voluntary," and provided a toll-free telephone number for shareholders with questions. At worst, the notice left open the question whether shareholders had to proceed with Georgeson, or could still exchange through EquiServe. The fact that there were questions does not mean that the notice was fraudulent under Rule 10b-5. Given the earlier EquiServe notices, the December 15 notice disclosed all that the federal securities laws require.[10] Accordingly, AT&T and Georgeson cannot be liable under Rule 10b-5 for failing to include the EquiServe option in the December 15 notice because there was no duty of disclosure and, alternatively,

_____

[10] Starr can reasonably (even if wrongly) be read as holding that, even without the prior notices, there was no duty to disclose the cost-free option in the Georgeson notice because the omission did not render the notice literally untrue, i.e., "[t]hose statements were accurate as far as they went." 287 F.Supp.2d at 413-14. To the extent that is the holding of Starr, we do not read the duty of disclosure under Rule 10b-5 so narrowly. A statement, though literally accurate, can still mislead investors through its context and manner of presentation. See Lindelow v. Hill, 2001 WL 830956, at *3 (N.D. Ill. July 20, 2001) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead [investors].") Here, even though the statements in the December 15 notice were literally true, absent the June and August 2000 notices, it would at least be a jury question whether they nonetheless were misleading.

because the omission was not material.

     *2.    Failure to Disclose Total Amount of the Processing Fee*

     Gavin's next claim, asserted only against Georgeson, is that its failure to disclose the total amount of the processing fee in the December 15 notice is an actionable omission.  The notice clearly stated that the fee would be $7 for each share of AT&T to be received, and the claim card attached to the notice indicated the number of those shares.  Georgeson's failure to perform the one-step multiplication required to ascertain the total fee is not an omission for which the securities laws provide redress.  See Starr, 287 F.Supp.2d at 414.  The securities laws are intended to require fair disclosure, but do not require corporations to "attribute to investors a child-like simplicity. . . ."  Basic, Inc. v. Levinson, 485 U.S. 224, 234 (1988); see also Ash v. LFE Corp., 525 F.2d 215, 219 (3d Cir. 1975) ("We decline to hold that those responsible for the preparation of proxy solicitations must assume that stockholders cannot perform simple subtraction.")  This claim fails.

     *3.    Alleged Representation that the Shares Had to be Exchanged Immediately*

     Gavin contends that both defendants, through the December 15 notice, misrepresented to shareholders that if they did not exchange their shares immediately, their shares would be deemed abandoned and escheat to the state authorities.  Gavin points to the following language in the notice:

> We have retained Georgeson Shareholder Communications Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now.
>
> *    *    *
>
> **There is no benefit in continuing to hold your old shares. Eventually, if you continue to do nothing, your stock and underlying assets will be turned over to certain state authorities under the abandoned property laws.**

(AT&T Ex. E.) While the notice does convey a sense of urgency, we fail to find an actionable misrepresentation. Each of the three notices sent to the US West shareholders contains some language urging them to respond. The additional warning in the December 15 notice of the eventual consequences of "doing nothing" is reasonable in light of the recipients' failure to respond to the earlier notices. See Starr, 287 F.Supp.2d at 413. Shareholders with questions were provided with a toll-free telephone number, and there is no evidence to suggest that shareholders were told that a failure to exchange shares immediately would result in a forfeiture of their investment. Defendants are entitled to summary judgment on this claim as well.

In sum, there is no evidence from which a jury could reasonably conclude that the December 15 notice was fraudulent in violation of Rule 10b-5.

**B.    Failure to Disclose Alternative Means of Exchange When Shareholders Inquired About the Fee**

In addition to alleging that the December 15 notice was misleading, Gavin claims that shareholders who spoke with defendants' agents after receipt of the notice were again misled, this time orally, into believing that Georgeson provided the exclusive means of exchange.

On this claim, AT&T and Georgeson are not in the same boat. The record shows that any US West shareholder who contacted AT&T to complain about the fee *was* told how to effect the exchange at no cost through EquiServe. Moreover, AT&T instructed Georgeson to do the same. Quite simply, we find no misrepresentation. AT&T is therefore entitled to judgment as a matter of law on the claim that it misrepresented to shareholders that Georgeson provided the only way to exchange their shares.

As for Georgeson, the record is less clear. It is undisputed that many of the shareholders who complained to Georgeson nonetheless ended up exchanging their shares through Georgeson and paying a fee, either in full or some reduced amount. According to Gavin, this creates a fact issue as to whether Georgeson agents misrepresented to these shareholders that they had no other exchange option. Georgeson presents a host of arguments, often overlapping, as to why it is entitled to judgment as a matter of law.

Georgeson's primary argument, again relying on <u>Starr</u>, is that just as it had no duty to disclose the EquiServe alternative

in the notice, its telephone agents likewise had no duty of disclosure. Georgeson's reliance on Starr here is misplaced. The allegations of fraud in Starr were limited to what was said, or not said, in the notice. Once the court found that there was nothing fraudulent about the notice, that was the end of the matter. Indeed, the court assumed – and quite reasonably absent any allegations to the contrary – that any Airtouch shareholder who did inquire about the Georgeson exchange would *not* have been misled: "[a]ny stockholder dissatisfied with the Georgeson proposition could with minimal diligence have investigated the already-disclosed means of exchange." 287 F.Supp.2d at 414. What Gavin asserts is that US West shareholders *did* "investigate," but were once again misled to believe that Georgeson was the exclusive means of exchange. Starr has no relevance to these allegations.

Under Rule 10b-5, whether statements or omissions are misleading may depend on "the circumstances under which they were made." 17 C.F.R. § 240.10b-5. A statement or omission that is innocent in one context may become misleading in another. There was no duty to include the EquiServe information in the December 15 notice because, in the context of that notice, the omission did not render it misleading. The notice sought to inform shareholders of a "voluntary program" in addition to the already-disclosed EquiServe alternative. The fact that shareholders had questions on their available options does not make the notice misleading; the

notice did not purport to answer those questions. But once shareholders called Georgeson to complain about the fee, invariably asking why or whether it had to be paid, Georgeson's agents had a duty of full disclose and omitting the most important piece of information, a free alternative, would be actionably misleading. See Stransky, 51 F.3d at 1331 ("If one speaks, he must speak the whole truth.")

Next, Georgeson argues that even if it had a duty of disclosure, Gavin "has not presented any evidence of stockholders affirmatively being told by GSCI that there was no alternative to the PMC program." (Georgeson Reply Br., p. 7.) This argument is defective on multiple levels. For starters, while it is true that Gavin has not presented any *direct* evidence of a Georgeson agent telling a shareholder that it provided the exclusive means of exchange, to prevail on summary judgment, or even at trial, Gavin does not necessarily have to do so. She has come forward with ample *circumstantial* evidence – namely, that shareholders called to complain, spoke with a Georgeson representative, and still ended up paying a fee they wanted to avoid – which, if believed, could lead a jury to reasonably conclude that Georgeson agents misrepresented to shareholders that it provided the exclusive means of exchange.

Moreover, Georgeson assumes that as long as shareholders were not "affirmatively being told by GSCI that there was no alternative to the PMC program," it escapes liability under Rule

10b-5. Not so. Rule 10b-5 does not require an out-and-out lie. If, as Gavin alleges, Georgeson agents omitted to tell shareholders who were seeking to avoid the fee about the cost-free alternatives, such an omission may be actionable. See Tricontinental Indus. Ltd. v. Anixter, 215 F.Supp.2d 942, 948 (N.D. Ill. 2002) ("Rule 10b-5 prohibits more than statements that are facially false; it prohibits the omission of a material fact that would render statements made misleading.") (citation omitted); Charles Hughes & Co. v. Securities and Exch. Comm., 139 F.2d 434, 437 (2d Cir. 1943) ("The law of fraud knows no difference between express representation on the one hand and implied misrepresentation or concealment on the other.")

Georgeson's third argument is that because it fulfilled its obligations under the PMC Agreement's referral provision, it did all that the law requires. The Agreement provides: "During the program, if any shareholder contacts GSC inquiring about how they can contact the transfer agent directly to facilitate their exchange, GSC will direct them to the transfer agent without charge." (AT&T Ex. D.) Georgeson reads the provision narrowly as obligating it "to provide stockholders with EquiServe's contact information if asked." (Georgeson Reply, p. 7 n. 8.) First, Georgeson's obligations to AT&T under the PMC Agreement, whatever they were, are irrelevant to its obligations to US West shareholders under the federal securities laws. And to the extent

Georgeson is arguing that its duties under the Agreement are coextensive with those under Rule 10b-5, it is mistaken. A brief example illustrates the point. In one of the complaints summarized above, a shareholder "asked if there was a way to avoid this." (Gavin Ex. 2.) Under Georgeson's reading of the provision, and maybe even a plain reading, it is not clear that there is an obligation to notify the shareholder of the EquiServe alternative. After all, the shareholder did not expressly ask for EquiServe's contact information. Under Rule 10b-5, however, there would be a clear duty to disclose the alternative cost-free means of exchange. Georgeson's obligations under the PMC Agreement, and whether they were met, are irrelevant to whether it may be liable under Rule 10b-5.

For its fourth argument, Georgeson maintains that Gavin has not presented adequate evidence of its "scienter." To satisfy the scienter requirement of Section 10(b) and Rule 10b-5, a plaintiff must demonstrate that a defendant either had "the intent to deceive, manipulate or defraud," Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976), or a "reckless disregard for the truth of the material asserted whether by commission or omission." Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044 (7th Cir. 1977). "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which

presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." <u>Id</u>. at 1045. This argument need not detain us long. Here, a strong inference of scienter follows closely from the evidence of Georgeson's agents' misrepresentations. The evidence is that many shareholders who telephoned Georgeson to object to the fee nonetheless ended up paying it. If this is sufficient to raise a triable issue on whether the agents failed to inform shareholders of the EquiServe choice, and it is, then it also raises a genuine issue on the scienter element because it is at least as likely as not that the agents were extremely reckless if indeed they omitted to disclose the free alternative. Georgeson's scienter argument does not move us.

Finally, Georgeson contends that even if its agents *did* mislead shareholders, those oral statements or omissions are "trumped" by the existing written EquiServe notices. The cases cited by Georgeson – <u>Acme Propane, Inc. V. Tenexco, Inc.</u>, 844 F.2d 1317, 1322 (7th Cir. 1988) and <u>Teamsters Local 282 Pension Trust Fund v. Angelos,</u> 762 F.2d 522, 530 (7th Cir. 1985) – stand for the basic proposition that under the securities laws, a written disclosure will control over any inconsistent oral statement. The rationale for the principle was explained in <u>Acme Propane</u>:

> [T]he securities laws are designed to encourage the complete and careful written presentation of material information. A seller who fully discloses all material information in writing

should be secure in the knowledge that it has done
what the law requires. Just as in the law of
contracts a written declaration informing one
party of an important fact dominates a contrary
oral representation, so in the law of securities a
written disclosure trumps an inconsistent oral
statement. Otherwise even the most careful seller
is at risk, for it is easy to claim: "Despite what
the written documents say, one of your agents told
me something else." If such a claim of oral
inconsistency were enough, sellers' risk would be
greatly enlarged. All buyers would have to pay a
risk premium to cover this extra cost of doing
business.

844 F.2d at 1322. According to Georgeson, then, even if its agents

misled shareholders to believe it provided the exclusive means of

exchange, those statements (or omissions) are not material because

the EquiServe alternative was already disclosed. Acme Propane,

however, placed an important limitation on the written disclosure

rule: "we shall insist that the written words be true, clear, and

complete, in order to be dispositive." 844 F.2d at 1325. This

qualification is not satisfied here. If a complaining shareholder

was told by a Georgeson agent that "this is the only way to go,"

there was nothing in an earlier written disclosure that "clearly"

and "completely" contradicted that statement. Indeed, as discussed

supra, even a shareholder with all of the notices in front of him

might still reasonably wonder what his exchange options were. This

is not a case in which shareholders, in relying on Georgeson

agents' oral representations, closed their eyes to a plain written

provision that should have alerted them to the falsity of those

representations. The written disclosure rule does not apply here.

In the end, Georgeson's most compelling argument is one that it appears to have been abandoned. At a status hearing on December 15, 2004, Georgeson's counsel stated: "Well, there are – – there are reasons, your Honor, and I believe we've set them forth in our motion, and we'll reply – – as to why someone would decide to pay a fee as opposed to doing something for free." (Tr. Dec. 15, 2004 Hrg., pp. 14-15.) These "reasons" have not surfaced. Obviously, if there were evidence that Georgeson offered some service or benefit not provided by EquiServe, then a factfinder might naturally infer that complaining shareholders participated in the Georgeson program because they desired to take advantage of that service. Without that evidence, however, there is a question for the jury whether the reason shareholders would forego the EquiServe option in favor of Georgeson's program is simply because the shareholders were not told about, or that they could still participate in, the EquiServe exchange.

## III.  **Excessive Mark-Up Claim**

Gavin claims that Georgeson's exacting of a $7 per share fee constitutes an "excessive mark-up" in violation of NASD Rules and Rule 10b-5. Broker-dealers often charge their customers a mark-up over a security's prevailing market price as compensation for effecting a stock trade. For example, when the securities purchased (or here, exchanged) have a market value of $10,000, and the broker charges its customers $500, the mark-up is $500, or five

percent. NASD Rules prohibit broker-dealers from charging "excessive" mark-ups,[11] and several circuits have recognized a private right of action under Section 10(b) and Rule 10b-5 against a broker-dealer who fails to disclose an excessive mark-up. <u>See Grandon v. Merrill Lynch, & Co.</u>, 147 F.3d 184, 189-90 (2d Cir. 1998); <u>Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.</u>, 132 F.3d 1017, 1033 (4th Cir. 1997); <u>Bank of Lexington & Trust Co. v. Vining-Sparks Sec. Inc.</u>, 959 F.2d 606, 613 (6th Cir. 1992).

Georgeson moves for summary judgment on one argument: it is not a broker-dealer. The parties do not dispute that an "excessive mark-up" claim is premised on a duty owed by, and therefore can only be asserted against, a broker-dealer. <u>See</u> <u>Bissell v. Merrill Lynch & Co.</u>, 937 F.Supp. 237, 246 n. 7 (S.D.N.Y. 1996) ("[A] broker-dealer, by holding itself out as competent to conduct a brokerage business, owes its customer certain duties, including the duty not to sell securities at prices far in excess of market prices.").

Georgeson proffers the affidavit of Ronald M. Boronkay, its Executive Vice President, which states, *inter alia*, that "GSCI is not a broker-dealer." (Boronkay Decl., p. 1.) In response, Gavin points to the PMC Agreement, which provides: "The exchanging

---

[11]Mark-ups for equity securities greater than 5% above the prevailing market price generally are considered to be unreasonable, and thus violative of NASD Rules. <u>See</u> NASD Conduct Rule 2440; Guideline IM-2440.

shareholders will be charged a processing fee by GSC's broker-dealer subsidiary, Georgeson Shareholder Securities Corporation, as mutually agreed upon by T and GSC." (AT&T Ex. D.) Gavin also submits what it refers to as "Georgeson's" broker-dealer registration. (Pl. Mot. Dismiss, Ex. 2.) The registration, however, is in the name of "NASD Member Firm Georgeson Shareholder Securities Corp." (Id.) Finally, Gavin attaches an excerpt from Georgeson's website in support of her argument that Georgeson "touts itself" as a broker-dealer. But, again, the website only refers to Georgeson's "broker dealer subsidiary." (Pl. Mot. Dismiss, Ex. 1.) Nothing that Gavin has submitted rebuts Georgeson's credible evidence that it is not a broker-dealer. Her evidence only demonstrates that a Georgeson subsidiary, Georgeson Shareholder Securities Corporation ("GSSC"), is a NASD-registered broker-dealer. Gavin's muddling of the distinction between the two entities by using "Georgeson" interchangably does not create a fact issue. The record is clear – Georgeson is not a broker-dealer.[12]

There are other problems with this claim that have been overlooked and that cannot be cured by an amendment. A broker-dealer may be liable under Rule 10b-5 for charging an excessive

---

[12]Gavin is aware that Georgeson and GSSC are separate corporations. See Sec. Am Compl., ¶ 46 ("Georgeson (especially its GSSC subsidiary, a registered broker-dealer) . . . ."); see also December 15 notice ("[A] fee of $7 per AT&T share due you will be . . . paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC.").

mark-up, but only when the mark-up is not disclosed.  It is not the fact that the fee is excessive that triggers the antifraud provisions of the federal securities laws; it is the fact that it is hidden.  <u>See</u> <u>Grandon</u>, 147 F.3d at 193 ("[W]e must also seek, under § 10(b) and Rule 10b-5, to protect customers from paying excessive markups that, *because they remain undisclosed*, are fraudulent.") (emphasis added.)  Here, the $7 fee *was* disclosed, so Rule 10b-5 does not come into play.

Gavin correctly points out that charging a mark-up that is excessive will violate NASD Rules, even if it is disclosed.  <u>See</u> NASD Rule IM-2440(b)(5) ("Disclosure itself . . . does not justify a commission or mark-up which is unfair or excessive in light of all other relevant circumstances.").  What Gavin fails to recognize, however, is that there is no private right of action for the enforcement of exchange rules.  <u>See</u> <u>Spicer v. Chicago Board of Options Exchange, Inc.</u>, 977 F.2d 255, 266 (7th Cir. 1992). Accordingly, because Georgeson is not a broker-dealer, and just as fundamental, because neither Rule 10b-5 nor the NASD Rules provide an avenue for relief, Gavin cannot prevail on her excessive markup claim.

## IV.    **State Law Claims**

Gavin alleges state law claims against both AT&T and Georgeson for breach of fiduciary duty and constructive fraud. Twice already, once by Judge Nordberg and again by this court,

Gavin's claims for breach of fiduciary duty and constructive fraud (along with three other state law claims) have been dismissed as preempted by SLUSA.

The allegations in the present claims are substantively identical to those asserted in the twice-dismissed counts. But instead of being pled under Illinois law, they are now brought under the law of New York. By recasting his claims under New York law, Gavin attempts to bring them within the so-called "Delaware carve-out," a provision of SLUSA which "preserves," or exempts from preemption, certain "covered class actions" that are based on the law of the stock issuer's state of incorporation:

> (1) Actions under State law of State of Incorporation
> (A) Actions preserved
> Notwithstanding subsection (b) or (c), a covered class action described in subparagraph (B) of this paragraph that is based upon the statutory or common law of the State in which the issuer is incorporated . . . may be maintained in a State or Federal court by a private party.
> (B) Permissible actions
> A covered class action is described in this clause if it involves –
> (I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or
> (II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that – (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and (bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

15 U.S.C. § 78bb(f)(3)(A)(ii).

The "Delaware carve-out" does not apply to Gavin's claims against either defendant.  It does not cover the claims against Georgeson: the claims are based on New York law; Georgeson is a Delaware company.  See Greaves v. McAuley, 264 F.Supp.2d 1078, 1084 (N.D. Ga. 2003).  AT&T is a New York company, but the other statutory criteria are not satisfied.  As for subpart (I), although this action "involves . . . the purchase or sale of securities," the purchase or sale was not made "by the issuer or an affiliate of the issuer *exclusively from or to holders of equity securities of the issuer.*"  15 U.S.C. § 78bb(f)(3)(A)(ii)(I) (emphasis added).  As a result of the merger of AT&T and MediaOne, holders of MediaOne and US West shares acquired AT&T stock by exchanging their MediaOne or US West shares for shares of AT&T. Any sale of AT&T stock under the PMC was made to MediaOne and US West shareholders, not to existing AT&T shareholders.

Under subpart (II), the complaint's allegations do not concern decisions of AT&T shareholders "with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights."  15 U.S.C. § 78bb(f)(3)(A)(ii)(II)(bb).  This suit involves a post-merger cleanup program that was conducted well after any communications had been made regarding  decisions of shareholders acting in response to a tender or exchange offer.  Accordingly, Gavin's

state law claims are, once again, dismissed as preempted by SLUSA.[13]

## CONCLUSION

In summary, AT&T's motion for summary judgment is granted on all Counts. Georgeson's motion for summary judgment is granted on Counts I and III, and on Count II to the extent it alleges that the December 15 notice was misleading in violation of Rule 10b-5. What remains, then, is the allegation in Count II that Georgeson's telephone agents misled shareholders, in violation of Rule 10b-5, into believing that it provided the exclusive means of exchanging their shares.

The result of today's opinion is that the only named plaintiff, Gavin, has no claim. The individuals who may have claims are only the putative class members who made telephone inquiries of Georgeson. This means, of course, that Gavin is not suited to be the lead plaintiff of the class. Status is set for June 22, 2005, at 11:00, at which counsel should be prepared to discuss these and other issues related to class certification.

---

[13]Even if Gavin's state law claims were not preempted by SLUSA, they would be precluded by New York's "blue sky" law, the Martin Act, N.Y. Gen. Bus. Law § 352-c, which forecloses a private right of action for breach of fiduciary duty or constructive fraud in the context of securities transactions, reserving all enforcement responsibilities to the state attorney general. See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001) (affirming dismissal of breach of fiduciary duty claim as barred by Martin Act); Eagle Tenants Corp. v. Fishbein, 182 A.D.2d 610, 611, 582 N.Y.S.2d 218 (N.Y. App. Div. 1992) (constructive fraud).

DATE:    June 7, 2005

ENTER:   _____

John F. Grady, United States District Judge